[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-17176
_____

D.C. Docket No. 1:14-cv-03534-ELR

STARDUST, 3007 LLC,
d.b.a. Stardust,
MICHAEL MORRISON,

Plaintiffs - Counter Defendants -
Appellants,

versus

CITY OF BROOKHAVEN, GEORGIA,
SUSAN CANON,
individually and in her official capacity as Director
of Community Development,

Defendants - Counter Claimants -
Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(August 10, 2018)

Before WILLIAM PRYOR, JILL PRYOR and CLEVENGER,[*] Circuit Judges.

JILL PRYOR, Circuit Judge:

The City of Brookhaven passed an ordinance regulating adult businesses for the stated purpose of preventing the negative secondary effects of such businesses. Stardust, 3007 LLC—a purveyor of products subject to the City's ordinance—and Stardust's manager, Michael Morrison (collectively "Stardust"), brought suit in federal district court, claiming that the ordinance and the City's implementation of it violates the United States Constitution. The district court granted summary judgment to the City.[1] On appeal, Stardust argues: (1) the ordinance impermissibly restricts Stardust's constitutionally protected speech; (2) the ordinance is unconstitutionally vague, in violation of due process; (3) the City's enforcement of the ordinance violates Stardust's equal protection rights; and (4) the ordinance impermissibly infringes on individuals' substantive due process right to intimate sexual activity. After careful review, and with the benefit of oral argument, we affirm.

## I.    BACKGROUND

---

[*] Honorable Raymond C. Clevenger III, United States Circuit Judge for the Federal Circuit Court of Appeals, sitting by designation.

[1] The district court also granted summary judgment to Susan Canon, individually and in her official capacity as the Director of Community Development. For purposes of this opinion, however, we will refer to the City only.

A.      The City's Sexually Oriented Business Code

The City of Brookhaven was incorporated in December 2012.  In January 2013, it enacted a code to "regulate sexually oriented businesses in order to promote the health, safety, and general welfare of the citizens of the City, and to establish reasonable and uniform regulations to prevent the deleterious secondary effects of sexually oriented businesses within the City."  Doc. 5-2 at 3.[2]  The Code regulates various types of adult businesses, which it refers to as "[s]exually [o]riented [b]usiness[es]," including, as relevant to this appeal, "sexual device shop[s]."  *Id.* at 9.  The Code, as amended in May 2013, defines a "[s]exual [d]evice shop" as "a commercial establishment that regularly features sexual devices.  This definition shall not be construed to include any pharmacy, drug store, medical clinic, or any establishment primarily dedicated to providing medical or healthcare products or services."  Doc. 5-3 at 2-3.  A "[s]exual [d]evice" is defined in part as "any three (3) dimensional object designed for stimulation of the male or female human genitals, anus, buttocks, female breast, or for sadomasochistic use or abuse of oneself or others."  Doc. 5-2 at 9.  The Code defines "[r]egularly" to mean "the consistent and repeated doing of an act on an ongoing basis," *id.* at 8, and "[f]eature" to mean "to give special prominence to," doc. 5-3 at 2.

---

[2] All citations to "Doc #" refer to the numbered district court docket entries.

The Code does not ban sexually oriented businesses; rather, it sets up a licensing system for these businesses and their employees, requires sexually oriented businesses to submit to inspections, and sets requirements for, among other things, lighting, signs, and hours of operation. Under its "Spacing Requirements" provision, added in May 2013, the Code makes it unlawful to operate a sexually oriented business "within 100 feet of another sexually oriented business" or "within 300 feet of a residential district, place of worship, park, or public library." *Id.* at 3. There are 73 locations in the City where a licensed sexually oriented business could operate in compliance with these spacing requirements.

**B.    Stardust's Operation**

Shortly after the City's incorporation and enactment of the Code, Stardust opened a retail store in the City. In February 2013, Stardust applied for an occupation tax certificate, as required by Article II of Chapter 15 of the Code of the City of Brookhaven. On the application form, Stardust described its business as "Retail—Smoke Shop, Tobacco; related accessories; gifts." Doc. 5-8 at 2. Stardust denied in its application that it would operate a sexually oriented business as defined by the Code.

In April 2013, Stardust sent a letter notifying the City that Stardust planned to include, "as a non-principle [sic] business activity," merchandise covered by the

4

Code.  Doc. 63-22 at 1.  According to the letter, the part of the store containing these items would "occupy less than 500 sq. ft. of floor space, and constitute less than 35% of . . . displayed merchandise."  *Id.*  Stardust inquired whether it was required to amend its business license to "list these goods" or whether its current business license was sufficient.  *Id.*  The City apparently did not respond to the letter, and Stardust began selling sexual devices in late April 2013.

Located across the street from the Stardust store was a residential area, and located next to Stardust was Pink Pony, an adult entertainment club that qualified as a sexually oriented business under the Code.[3]  Pink Pony had been operating at that location since 1990.  Following the City's incorporation and the passing of the Code, Pink Pony sued the City over the Code and alcohol licensing issues.  *See Trop, Inc. v. City of Brookhaven*, 764 S.E.2d 398, 400-02 (Ga. 2014) (concluding that the Code did not violate Pink Pony's right to free speech by "separating alcohol from adult entertainment" (internal quotation marks omitted)).  As a result of the litigation, Pink Pony entered into an exit agreement with the City that required Pink Pony to relocate within a certain number of years.  In addition, Pink Pony agreed to pay for additional law enforcement to patrol the area around its building to combat any negative secondary effects of its business and to ensure that its permits and licensing were up to date.

---

[3] Pink Pony was an "[a]dult [c]abaret" under the Code.  Doc. 5-2 at 7.

5

In June 2013, the City began ticketing Stardust for (1) operating a sexually oriented business without a license, (2) operating a sexually oriented business within 100 feet of another sexually oriented business, (3) operating a sexually oriented business within 300 feet of a residential zone, and (4) failing to identify its line of business on its occupation tax certificate.

On multiple occasions, the City's code enforcement officers visited the Stardust store and identified merchandise that qualified as sexual devices. For example, the Brookhaven Code Enforcement Manager visited Stardust "dozens" of times between November 2013 and August 2014. Doc. 5-11 at 1. During two of those visits, she photographed products she believed to be sexual devices, and she testified that those products were the "same sort of items [she] saw on display every time" she went inside the store. *Id.*

In May 2015, another code enforcement officer counted over 1,500 alleged sexual devices in the Stardust store. The store contained three rooms, one in the front, and two—one large, one small—in the back. The officer counted well over 1,000 items in the larger back room, which she identified as the sexual device room. The smaller back room, according to the officer, contained 29 sexual devices, and the front room contained 88 such devices. Although Stardust admitted that it "stock[ed] and display[ed] a number of sexual devices," it disputed

6

that all of the items documented by the City qualified as sexual devices under the Code.  Doc. 77-1 at 22.

## C.    Litigation Between the Parties

The City brought a 255-count accusation against Stardust in Brookhaven Municipal Court in early 2014, alleging Code violations.  Stardust raised constitutional defenses to the charges, and in July 2014 it filed a civil suit in the Superior Court of DeKalb County, Georgia, seeking to enjoin enforcement of the Code on the grounds that it violated provisions of the United States and Georgia Constitutions.

Several months after filing suit in state court, in November 2014 Stardust filed suit against the City in federal district court, challenging the City's denial of Stardust's application for a sign permit as violating Stardust's rights under the United States and Georgia Constitutions.  The City counterclaimed, seeking injunctive relief requiring Stardust to cease operating a sexual device shop.[4]  In response, Stardust filed an amended complaint raising the claims at issue in this appeal.  The district court granted the City's motion for summary judgment on September 29, 2016, and Stardust appealed.

While this appeal was pending, on May 22, 2017, the superior court entered a permanent injunction against Stardust in the state court action, ordering it to

---

[4] The City's asserted reason for denying Stardust's sign application was that Stardust was operating unlawfully as an unlicensed sexually oriented business.

cease operating a sexual device shop in violation of the Code.  The Supreme Court of Georgia affirmed without opinion.

## II.    STANDARD OF REVIEW

We review *de novo* the district court's grant of summary judgment, construing the facts and all reasonable inferences from the facts in favor of the nonmoving party.  *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment."  *Cordoba v. Dillards, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (internal quotation marks omitted).

## III.    PRECLUSION

Before discussing the merits of Stardust's appeal, we address the impact of the state court litigation on our analysis.  Specifically, we consider whether the doctrine of res judicata precludes any of Stardust's claims.  "The general principle of res judicata prevents the relitigation of issues and claims already decided by a competent court.  Once a party has fought out a matter in litigation with the other party, he cannot later renew that duel."  *Comm. State Bank v. Strong*, 651 F.3d 1241, 1263 (11th Cir. 2011) (internal quotation marks omitted).  The enforcement

8

of res judicata principles "is essential to the maintenance of social order; for the aid of judicial tribunals would not be invoked for the vindication of rights of person and property if, as between parties and their privies, conclusiveness did not attend the judgment of such tribunals in respect of all matters properly put in issue, and actually determined by them." *S. Pac. Ry. Co. v. United States*, 168 U.S. 1, 49 (1897). "Res judicata comes in two forms: claim preclusion . . . and issue preclusion . . . ." *Comm. State Bank*, 651 F.3d at 1263. Because the distinction between claim preclusion and issue preclusion makes no difference for our purposes, we refer to both or either simply as "res judicata."

At first blush, it might appear that res judicata bars this action because in the state court action the Georgia courts adjudicated Stardust's claims regarding the constitutionality of the Code and the City's enforcement of it and decided the identical issues before us today. Before deciding whether we should apply the principles of res judicata, however, we must consider the nature of the Superior Court of DeKalb County's order and the Supreme Court of Georgia's summary affirmance. The superior court rejected Stardust's claims that the City had violated its rights under the United States and Georgia Constitutions. On Stardust's federal constitutional claims, the superior court held, based on the federal district court's September 29, 2016 order granting summary judgment to the City, that those claims were barred by the doctrine of res judicata. As to Stardust's claims based

9

on Georgia's Constitution, the superior court issued alternative rulings.  First, the superior court held that because the federal district court had found no violation of the United States Constitution—and because the Georgia constitutional provisions at issue were identical to the federal constitutional provisions—it was bound to rule in the City's favor based on doctrine of res judicata.  Second, the superior court held, in the alternative, that Stardust's claims failed on the merits.[5]  The Supreme Court of Georgia affirmed the superior court's order without an opinion.

The Supreme Court of Georgia's summary affirmance was issued pursuant to Georgia Supreme Court Rule 59.  Although a Rule 59 affirmance may be afforded preclusive effect, *see Rolleston Living Tr. v. Kennedy*, 591 S.E.2d 834, 835 (Ga. 2004), we cannot know the grounds on which the Supreme Court affirmed the superior court's decision, *see* Ga. Sup. Ct. R. 59 ("An affirmance without opinion may be rendered in any civil case when the Court determines . . . [there was] [n]o harmful error of law, properly raised and requiring reversal.").  Given the superior court's alternative rulings, the Supreme Court may have affirmed the superior court's holding that Stardust's claims failed on the merits.  Alternatively, it may have rejected that holding, affirming only on the ground that the doctrine of res judicata barred Stardust's claims.

---

[5] In reaching the merits, the superior court relied heavily on the federal district court's reasoning regarding the federal constitutional claims.

10

The possibility that the Supreme Court of Georgia affirmed on the ground that it was bound by the federal district court's decision in the instant litigation rather than on the merits prevents us from now holding that we, in turn, are bound by the Supreme Court's decision. The fact that the district court's judgment was pending appeal in this court does not mean the superior court erred in applying res judicata to Stardust's claims in state court based on that judgment. *See Jaffree v. Wallace*, 837 F.2d 1461, 1467 (11th Cir. 1998) (explaining that under federal common law, "a final judgment retains all of its res judicata consequences pending decision of the appeal" (internal quotation marks omitted)). Here, though, we are presented with a unique circumstance in which we as an appeals court are being asked to forgo direct review of a district court's judgment because another court decided it was bound to give that judgment preclusive effect. We conclude that, in this particular circumstance, res judicata does not bar the claims on appeal. To hold otherwise, as the First Circuit has said, would be "obviously circular and unfair." *In re Kane*, 254 F.3d 325, 329 (1st Cir. 2001).

Our court has never addressed this circumstance, but the Ninth Circuit has concluded that "the doctrine of res judicata does not operate to bar direct review of a district court judgment, even if that judgment has been accorded res judicata effect by other courts since it was entered." *Orion Tire Corp. v. Goodyear Tire & Rubber Co.*, 268 F.3d 1133, 1136 (9th Cir. 2001). A contrary rule would "turn[]

11

res judicata on its head" because the "[t]he doctrine is founded on the principle that '[a] judgment merely voidable because based upon an erroneous view of the law is not open to collateral attack, but can be corrected *only by a direct review*.'" *Id.* (alteration in original) (quoting *Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 399 (1981)).

Direct review of the district court's judgment is what Stardust now seeks; therefore, res judicata does not bar us from considering Stardust's appeal. *See In re Kane*, 254 F.3d at 330 ("Direct review of the erroneous original decision cannot be precluded because, in the meantime, the original court has repeated the error in the same case or other courts have adopted it by cross reference."); *Alpha Epsilon Phi Tau Chapter Hous. Ass'n v. City of Berkeley*, 114 F.3d 840, 843 n.3 (9th Cir. 1997) (explaining, in an opinion authored by Supreme Court Justice Byron R. White, that when a state court ruling was based on the res judicata effect of the district court's decision, the federal appeals court nonetheless could review the district court's judgment); *McLaughlin v. Alban*, 775 F.2d 389, 391 (D.C. Cir. 1985) (declining to afford preclusive effect to judgments that "relied wholly on the preclusive effect of decisions by the trial court in the instant case"). We agree with our sister circuits that it would make no sense for an appeal from a district court order or judgment to be precluded simply because another court treated the order or judgment as having preclusive effect. We conclude that res judicata does not

12

preclude Stardust from litigating its claims in this appeal, and thus we turn to the merits of those claims.

## IV.    DISCUSSION

On appeal, Stardust challenges the district court's grant of summary judgment to the City, arguing that its constitutional rights have been violated because:  (1) the Code impermissibly restricts Stardust's right to free speech; (2) the Code's definition of "sexual device shop" is void for vagueness; (3) the City's enforcement of the Code violates Stardust's right to equal protection; and (4) the Code impermissibly infringes on an individual substantive due process right to intimate sexual activity.  We will address each argument in turn.

## A.    The Code Imposes No Impermissible Restriction on Stardust's Freedom of Speech.

Stardust argues that the Code is unconstitutional under the Constitution's First Amendment because it operates as an impermissible restriction on Stardust's constitutionally protected commercial speech.  Specifically, Stardust challenges the definition of sexual device shop as a commercial establishment that "regularly features" sexual devices.  Doc. 5-3 at 2.  We conclude, however, that the Code's definition of sexual device shop does not unconstitutionally restrict Stardust's freedom of speech.

Before we consider whether the Code's definition of sexual device shop offends the First Amendment, we first must decide what it means to "regularly

13

feature[]" sexual devices.  According to Stardust, because the Code defines "regularly featur[ing]" sexual devices as regularly "giv[ing] special prominence to" those devices, whether a store falls within the Code's definition of sexual device shop depends on the manner in which the store displays its merchandise.  The City disputes that the Code regulates "how one may display sexual devices in a commercial establishment."  Appellee's Br. at 11 (internal quotation marks omitted).  Although the question is a close one, we agree with Stardust.

Stardust's interpretation of the meaning of "regularly features" finds support in the Code's text.  The Code defines another type of sexually oriented business, an "[a]dult [b]ookstore or [a]dult [v]ideo [s]tore," as an establishment that, as one of its "principal business activities," offers for sale or rental certain listed items.  Doc. 5-2 at 6.  A "principal business activity" exists where one of several factors is met, including "[a]t least 35% of the establishment's displayed merchandise consists of said items," "[t]he establishment maintains at least 35% of its floor space for the display, sale, and/or rental of said items," "[t]he establishment maintains at least five hundred square feet . . . of its floor space for the display, sale, and/or rental of said items," or "[t]he establishment regularly features said items."  *Id.*  By including "regularly features" as one of these alternatives, the Code's definition of "principal business activity" suggests that "regularly features" must mean something other than the number of items, percentage of inventory, or amount of

floor space, because other listed alternatives define "principal business activity" based on those factors. *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be constructed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . ." (internal quotation marks omitted)).

We acknowledge that the canon of *noscitur a sociis*, "which holds that a word is known by the company it keeps," *Babbit v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 694 (1995), may suggest a contrary interpretation. Specifically, application of this canon may indicate that "regularly features"—like percentage of inventory or amount of floor space—refers to a quantifiable amount of stocked merchandise rather than to a restriction on the manner in which the store displays its merchandise. But the Code states that "there is documented evidence of sexually oriented businesses, including adult bookstores and adult video stores, manipulating their inventory and/or business practices to avoid regulation while retaining their essentially 'adult' nature." Doc. 5-2 at 1. In context, then, applying the canon of *noscitur a sociis* would be inconsistent with the expressed intent of the Code's drafters to regulate adult businesses that are not captured by quantifiable caps on inventory and floor space. We therefore conclude that the Code's definition of sexual device shop turns not only on the store's stocking and

15

selling of certain products, but also on its display and arrangement of those products.

Having decided that the Code defines sexual device shop with reference to a store's manner of displaying and arranging products, we must decide whether a restriction based on product display and arrangement offends the First Amendment. As an initial matter, neither the United States Supreme Court nor this court has ever held that a business has a free speech interest in the display and arrangement of commercial products, let alone that regulation of such activity might violate the First Amendment. The Supreme Court has assumed that such an interest exists, however, concluding under the facts before it that an ordinance requiring tobacco products to be placed behind counters nonetheless satisfied the First Amendment. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 569 (2001) ("Assuming that petitioners have a cognizable speech interest in a particular means of displaying their products, these regulations withstand First Amendment scrutiny." (citation omitted)). We follow the same approach and assume, for our purposes here, that the Code's definition of sexual device shop implicates the First Amendment.

Of course, not all laws implicating the First Amendment are unconstitutional. A zoning ordinance designed to regulate the negative secondary effects of adult businesses, "justified without reference to the content of the

16

regulated speech," is considered a content neutral time, place, and manner restriction. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986) (internal quotation marks omitted). Despite its incidental impact on free speech, such an ordinance complies with the First Amendment if it is designed to serve a substantial government interest and leaves open alternative avenues of communication. *Id.* at 50.[6]

The Code represents a time, place, and manner restriction that regulates where and when adult businesses may operate. Further, the City has a substantial interest, unrelated to the content of the speech at issue, in regulating negative secondary effects of adult businesses. *See id.* ("[A] city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect." (internal quotation marks omitted)).

We thus consider only whether the Code is designed to serve that interest and whether it leaves open alternative avenues of communication. As to the first consideration, the City must point to specific evidence it relied upon when drafting

---

[6] In *Lorillard Tobacco Co.*, the Supreme Court analyzed the constitutionality of a restriction on the manner of product display in a commercial establishment under the test the Court has applied "when 'speech' and 'nonspeech' elements are combined in the same course of conduct" and the government has an interest in "regulating the nonspeech element." *United States v. O'Brien*, 391 U.S. 367, 376, 382 (1968); *see Lorillard Tobacco Co.*, 533 U.S. at 569. Neither party argues that *O'Brien* is applicable here, however. Stardust argues instead that the Supreme Court's test for commercial speech applies. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980). *O'Brien*, *Central Hudson*, and *Renton* each require intermediate scrutiny and a consideration of similar elements. Thus, under any of these tests, our analysis would be similar and our conclusion would be the same.

17

the Code that supports the conclusion that the Code advances its interest in preventing negative secondary effects.  *See Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cty.* (*Peek-A-Boo II*), 630 F.3d 1346, 1355 (11th Cir. 2011).  If the City meets this burden, the "burden shifts to [Stardust] to cast direct doubt on this rationale."  *Id.* (internal quotation marks omitted).

When drafting the Code the City relied on—and cited—dozens of studies and cases linking the operation of adult businesses to negative secondary effects. This evidence is sufficient to establish that the Code, in general, advances the City's legitimate interest in regulating those effects.  We next ask a more nuanced question—whether, on the record before us, the City has met its burden to show that its particular definition of sexual device shop furthers its interest in avoiding the secondary effects of adult businesses.  In drafting the Code, the City was entitled to rely on evidence "reasonably believed to be relevant."  *Renton,* 475 U.S. at 51-52.  Here, as the district court noted, the City relied on specific case examples of adult businesses "manipulating their inventory . . . to avoid regulation."  Doc. 5-2 at 1.

For example, the Code cites a case in which the Texas Court of Appeals upheld a jury's determination that the defendant operated a "sexually-oriented enterprise" without a license.  *Taylor v. State*, No. 01-01-00505, 2002 WL 1722154, at *1-*4 (Tex. Ct. App. July 25, 2002).  Although the majority of

18

merchandise in the store was non-adult, *id.* at *3, investigating officers testified

that they never saw any customers in the non-adult section of the store, *id.* at *4.

Additionally, some of the non-adult videos had cobwebs, but the adult videos were

"newly packaged and . . . not covered with cobwebs." *Id.* The Code's definition

of sexual device shop may help prevent the kind of manipulation that occurred in

*Taylor* and which the Code intends to regulate.[7] *See* Doc. 5-2 at 1-2 (citing to

*Taylor* and other cases as justification for the City's intention to regulate

businesses that "manipulate[] their inventory . . . while retaining their essentially

'adult' nature"). Because the City "has produced evidence that it reasonably

believed to be relevant to its rationale," *Peek-a-Boo II*, 630 F.3d at 1357, the City

has met its burden of showing that the definition of sexual device shop furthers its

interest in regulating the secondary effects of adult businesses. The burden thus

shifts to Stardust to "cast direct doubt on the [City's] rationale, either by showing

that the [City's] evidence does not actually support its rationale or by producing

evidence disputing the [City's] factual findings." *Id.* Stardust has failed to do so.

This case is unlike *Peek-A-Boo Lounge of Bradenton, Inc., v. Manatee

County* (*Peek-A-Boo I*), 337 F.3d 1251, 1270 (11th Cir. 2003), for example, where

we concluded that the plaintiffs had produced sufficient evidence to "cast direct

doubt" on the challenged ordinance. In that case, the plaintiffs had submitted

---

[7] We do not suggest that Stardust engaged in such manipulation.

19

satisfactory health and safety reports, incident reports showing that crime rates were lower near their businesses than in other areas, data revealing an increase in property values near the plaintiffs' businesses, an award given to one plaintiff by the County Sheriff for its contribution to the community, and three expert studies disputing the County's evidence and rationale. *Id.* We held that summary judgment was inappropriate and "the burden shift[ed] back to the municipality to supplement the record with evidence renewing support for a theory that justifie[d] its ordinance." *Id.* at 1272 (internal quotation marks omitted).

Unlike the plaintiffs in *Peek-A-Boo I*, Stardust has presented no evidence disputing the City's rationale or factual findings. Instead, Stardust relies on rhetorical questions, asking, for example, "Who is harmed by a retail store advertising—*inside its premises*—sexual devices in a way that 'gives special prominence to' them?" Appellant's Br. at 17. This kind of speculative reasoning is insufficient to survive summary judgment. *See Cordoba*, 419 F.3d at 1181.

Stardust also argues that the Code's definition of sexual device shop is underinclusive because it exempts pharmacies and establishments primarily dedicated to healthcare products, and those establishments may cause the same negative secondary effects the Code intends to regulate. According to Stardust, the underinclusive nature of the definition undercuts the City's justification for its definition of sexual device shop. But there is no evidence in the record that any

Brookhaven pharmacies or other establishments primarily dedicated to healthcare products regularly feature sexual devices or cause negative secondary effects. The City is entitled to amend the Code if and when it learns that establishments falling within the healthcare exception are regularly featuring sexual devices and bringing about negative secondary effects. *See Renton*, 475 U.S. at 52-53 (rejecting an argument that an ordinance regulating adult theaters was underinclusive because it did not regulate other types of adult establishments, where there was no evidence that other adult businesses were located in the city, and noting that the city could, in the future, "amend its ordinance to include other kinds of adult businesses that have been shown to produce the same kinds of secondary effects as adult theaters").

We now turn to the final consideration under *Renton*—whether the Code leaves open sufficient alternative avenues of communication. "A new zoning regime must leave adult businesses with a reasonable opportunity to relocate, and the number of sites available for adult businesses . . . must be greater than or equal to the number of adult businesses in existence at the time the new zoning regime takes effect." *Daytona Grand, Inc. v. City of Daytona Beach*, 490 F.3d 860, 871 (11th Cir. 2007) (internal quotation marks omitted).

The record establishes that the City has, at most, two adult businesses, Stardust and Pink Pony. The City has identified 73 sites inside its city limits where

21

a licensed sexually oriented business could operate.  The number of sites—which

Stardust does not dispute on appeal—is far greater than the number of adult

businesses.  And Stardust does not argue that some reason other than the number of

compliant locations prevents it from relocating.  The Code therefore leaves opens

sufficient alternative avenues of communication to meet the *Renton* test.  *See id.* at

871-72 (concluding that the existence of 24 sites in the district was sufficient for

First Amendment purposes and noting that whether the property was in fact

available for sale or development was irrelevant).

"A zoning measure can be consistent with the First Amendment if it is likely

to cause a significant decrease in secondary effects and a trivial decrease in the

quantity of speech."  *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425,

445 (2002) (Kennedy, J., concurring in the judgment).[8]  The Code is such a zoning

measure; it does not impermissibly infringe Stardust's First Amendment right to

display and arrange its products.

**B.    The Code Is Not Unconstitutionally Vague.**

Stardust next argues that two phrases in the Code are impermissibly vague,

in violation of the Due Process Clause of the Fourteenth Amendment.  First, it

argues that the phrase "establishment primarily dedicated to healthcare products" is

---

[8] "There was no majority opinion in *Alameda Books*, but because Justice Kennedy's concurrence reached the judgment on the narrowest grounds, his opinion represents the Supreme Court's holding in that case."  *Peek-A-Boo II*, 630 F.3d at 1354 n.7.

unconstitutionally vague because a reasonable person could not know what it means to be "primarily dedicated" to such products. Second, it argues that the term "[f]eature," which is defined in the Code to mean "to give special prominence to," is also impermissibly vague.

The Constitution does not require perfect clarity in the language of statutes and ordinances. "All . . . due process . . . requires is fair notice . . . sufficient to enable persons of ordinary intelligence to avoid conduct which the law forbids." *High Ol'Times, Inc. v. Busbee*, 673 F.2d 1225, 1229 (11th Cir. 1982). To succeed on a claim that an ordinance is void for vagueness, "the complainant must demonstrate that the law is impermissibly vague in all of its applications." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982). A corollary of this rule is that "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* at 495.

On this record, Stardust lacks a genuine question regarding whether its business is "primarily dedicated to healthcare products." Likewise, whether "special prominence" turns on number, variety, or arrangement and display of sexual devices, "persons of ordinary intelligence," could recognize that Stardust gave special prominence to sexual devices in its store. *High Ol' Times, Inc.*, 673 F.2d at 1229. Indeed, Stardust displayed hundreds of different types of sexual

23

devices in its store, devoting to them an entire room plus space in other rooms.

The district court therefore correctly concluded that Stardust's vagueness challenge

fails because its operation clearly falls within the zone of prohibited conduct. *See*

*Vill. of Hoffman Estates, Inc.*, 455 U.S. at 495.

## C.    The City's Enforcement of the Code Does Not Violate Stardust's Right to Equal Protection.

Stardust also argues that its right to equal protection under the Fourteenth

Amendment was violated because the City has allowed Pink Pony—also a sexually

oriented business operating within 100 feet of another sexually oriented business—

to continue to operate while the City has continued to issue citations to Stardust.

The Supreme Court has recognized this kind of "class of one" equal protection

claim in which a party "alleges that [it] has been intentionally treated differently

from others similarly situated and that there is no rational basis for the difference

in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  This court

has held that the plaintiff and the comparator were not similarly situated where,

although both companies "had received high pollutant readings," only the

comparator had alerted the Environmental Protection Division to the problem and

voluntarily cooperated with remediation efforts. *Griffin Indus., Inc. v. Irvin*, 496

F.3d 1189, 1206 (11th Cir. 2007).

Stardust has not demonstrated that it is similarly situated to Pink Pony.

Stardust argues that Pink Pony is a similarly situated business because it also is a

24

sexually oriented business and both businesses were in existence when the City added the spacing requirements to the Code. But Stardust ignores relevant differences between the two establishments. Pink Pony had lawfully operated in its location for more than 20 years before the City enacted the Code, but Stardust first opened its doors after the Code was passed. And Pink Pony—unlike Stardust—has cooperated with the City to counteract secondary effects by agreeing to pay for additional police presence, ensure that its licensing and permits are up to date, and relocate within a set number of years. As in *Griffin*, Pink Pony's cooperation precludes a determination that it is similarly situated to Stardust.

But, as the district court noted, even if Stardust and Pink Pony were similarly situated, the City's unequal treatment of the two businesses passes rational basis review. *See Vill. of Willowbrook*, 528 U.S. at 564. The Code prohibits a sexually oriented business from locating within 100 feet of another sexually oriented business. Because Stardust and Pink Pony were operating within 100 feet of each other, and both were sexually oriented businesses, "it is beyond cavil that, to comply with the statute, one may stay and one must go." Doc. 104 at 31. We cannot say that the City's decision to allow Pink Pony—which cooperated with the City and which operated lawfully in its location for many years before the Code was enacted and before Stardust, which opened only after the Code was

25

passed, established its store—to continue to operate while enforcing the Code against Stardust was not rational.[9]  Stardust's equal protection claim therefore fails.

## D.    The Code Does Not Impermissibly Infringe on the Substantive Due Process Right to Private Sexual Intimacy.

Stardust argues that the Code infringes on a constitutional right to private sexual intimacy, but it acknowledges that based on our prior panel precedent, there is no "substantive due process right of consenting adults to engage in private intimate sexual conduct."  *Williams v. Attorney Gen. of Ala.*, 378 F.3d 1232, 1236 (11th Cir. 2004) (emphasis omitted).  Under our prior panel precedent rule, a holding by a prior panel is binding unless there is "a clearly contrary opinion of the Supreme Court or of this court sitting en banc."  *Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*, 344 F.3d 1288, 1292 (11th Cir. 2003) (emphasis and internal quotation marks omitted).

Stardust suggests that we should reconsider *Williams* in light of the Supreme Court's decisions in *United States v. Windsor*, 570 U.S. 744 (2013), and *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015).  We need not decide whether these cases have abrogated *Williams* because we cannot agree with Stardust that the Code infringes on any constitutional right to private sexual intimacy.  As we explained in Part IV.A, the Code—a zoning ordinance—is a valid time, place and manner restriction

---

[9] We note that, although the City's decision to allow Pink Pony to continue to operate in that location passes rational basis review, Pink Pony will not operate in that location indefinitely. Under its exit agreement with the City, it must relocate in a set number of years.

that leaves open 73 sites within the City for the operation of adult businesses, including sexual device stores. It neither bans the sale or use of sexual devices in the City nor impedes any individual's ability to engage in private, consensual sexual activity. We thus reject Stardust's argument that the Code violates a substantive due process right to private sexual intimacy.

## V.    CONCLUSION

We affirm the district court's grant of summary judgment to the City.

**AFFIRMED.**

27